CALKINS DREDGING COMPANY, INC., v. THE STATE OF NORTH CARO-
LINA, THE FISHERIES COMMISSION OF NORTH CAROLINA, AND
THE FISHERIES COMMISSION BOARD OF NORTH CAROLINA.

(Filed 24 February, 1926.)

**1. Government — Claims Against State — Recommendatory Powers of Supreme Court—Constitutional Law.**

The original jurisdiction given the Supreme Court to pass upon claims against the State or its subordinate agencies of government, which are not subject to suit or execution under judgment, are recommendatory to the Legislature only, as to the matters of law involved upon facts agreed to, or made to appear, and this Court does not pass upon conflicting evidence to determine the facts at issue. Const., Art. IV, sec. 9.

**2. Same—Original Jurisdiction.**

The powers given the Supreme Court of the State to recommend to the Legislature the payment of claims against the State is original and exclusive.

**3. Government—Suits—Actions.**

Neither the State nor its subordinate agencies of government may be subject to suits or actions against it or them in its own courts or the courts of other states.

**4. Government — Claims Against State — Recommendation of Supreme Court—Questions of Law.**

The Supreme Court will not recommend to the Legislature the payment of a claim against the State, when no questions of law are involved, or when such questions are resolved against the claimant.

**5. Same—Dismissal.**

Where it is made to appear to the Supreme Court that a claimant against the State seeking the recommendatory jurisdiction of the Court is not entitled under its contract with a subordinate agency of the State to a favorable consideration, or to have its contract reformed in equity, and has taken the State's voucher in full payment, and has received the money therefor, there is shown no legal right to have the claim recommended by the Supreme Court, and the action will be dismissed.

PROCEEDING commenced by Calkins Dredging Company, Inc., under C. S., 1410, in the Supreme Court of North Carolina, invoking the original jurisdiction of said Court, conferred by Article IV, section 9 of the Constitution of North Carolina, to hear claims against the State, and to make recommendations with respect thereto, to the General Assembly, at its next session, for its action.

*C. R. Pugh and Thompson & Wilson for claimant.*
*Attorney-General Brummitt and Assistant Attorney-General Nash for respondents.*

CONNOR, J. The complaint herein, setting forth the nature and grounds of its claim, was filed by the Calkins Dredging Company, Inc., in the office of the clerk of this Court, on 19 November, 1925. The said complaint was duly served on the Governor of the State. Thereafter, on 1 December, 1925, answer on behalf of respondents was filed by the Attorney-General and the Assistant Attorney-General; a reply to said answer was filed by claimant on 1 January, 1926. The proceeding was then heard and considered by this Court upon the pleadings.

It appears from the allegations and admissions in said pleadings that claimant is a corporation, organized and existing under the laws of the State of Virginia, with its principal office and place of business in the city of Norfolk, in said state; that respondents, the Fisheries Commission of North Carolina, and the Fisheries Commission Board of North Carolina, are agencies of the State of North Carolina, created by statutes duly enacted by the General Assembly of said state, for the purpose of enforcing the laws of said state, relative to fish, and of promoting the fishing industry in said state. C. S., 1869, ch. 168, Public Laws 1923. The powers and duties of said respondents are defined in Article 3 of ch. 37, C. S., 1919, and amendments thereto. By chapter 162, Public Laws 1923, the Treasurer of the State was authorized and directed to issue bonds of the State of North Carolina, in the sum of $500,000, the proceeds of the sale of said bonds, or so much thereof as might be necessary, to be used by the Fisheries Commission "to open

inlets, plant oysters, build hatcheries, provide equipment, and for such other necessary improvements of the fish and sea-food industry of the State." It is expressly provided in said statute that the proceeds of the sale of said bonds shall be used by the Fisheries Commission for the purpose of opening inlets and providing necessary improvements to aid the fish and sea-food industry of the State. Chapter 162, Public Laws 1923, secs. 6 and 7.

Pursuant to authority vested in them by statute, respondents, the Fisheries Commission of North Carolina, and the Fisheries Commission Board of North Carolina, during the year 1924, employed the Calkins Dredging Company, Inc., claimant herein, to open New Inlet, in Dare County, by dredging and excavating same, and thereby constructing a channel in said inlet from Pamlico Sound to the Atlantic Ocean. The said inlet, through which there was formerly a channel of sufficient depth and width for the free flow of water between the ocean and the sound, had, in recent years, been gradually closing, from natural causes. The fishing industry of the State would, in the opinion of respondents, be permanently benefited by the opening of this inlet and the construction of a channel which would permit sea-fish to enter the sound through said inlet and would also permit the salt water of the ocean to flow into the sound where the water had become too fresh for proper oyster culture. The gradual closing of New Inlet, and of other inlets through the banks which lie between the Atlantic Ocean and the sounds into which the rivers of the State empty, has, in the opinion of experts, greatly diminished the supply of fish and sea-food, and thereby retarded the growth and expansion of the fishing industry of the State. The opening of these inlets by dredging and excavations was a part of the constructive program for the development of the State authorized and directed by the General Assembly, at its sessions in 1921 and 1923.

The work, which claimant was employed to do at New Inlet, was completed on or about 1 September, 1924, at a cost of about $115,000. It was approved and accepted by respondents. As the result of this work, an open channel between the Atlantic Ocean and Pamlico Sound through New Inlet had been constructed; there was a regular ebb and flow of the water through this channel, causing the level of the waters of the sound to rise and fall with the rise and fall of the tide in the ocean; there was a current of considerable volume and velocity flowing through this channel.

During January, 1925, less than six months after the completion of the work by claimant at New Inlet, respondents ascertained that the said inlet was again gradually closing by the filling in of the channel

constructed by the Calkins Dredging Company, Inc. This was caused by the action of the winds and water upon the sands which compose the banks through which the channel had been cut and which form the bottom of the ocean and the sound. Thereupon, respondents conferred with the president of the Calkins Dredging Company as to the conditions which had thus developed. As a result of the conference, an agreement in writing was entered into, at Morehead City, on 13 January, 1925, between the Calkins Dredging Company, Inc., and respondents. This agreement is as follows:

"This agreement made and entered into this 13 January, 1925, by and between the Calkins Dredging Company of Norfolk, Virginia, party of the first part, and the North Carolina Fisheries Commission Board, parties of the second part, witnesseth:

"1st. The Calkins Dredging Company have this day agreed to furnish their complete dredging outfit, the 'Federal,' which is now in first-class condition, and do certain dredging work at New Inlet under the direction of the Fisheries Commissioner and Brent S. Drane, engineer for the commission, said dredging outfit to be assembled in Norfolk and ready to be towed to New Inlet by January 20th, or very soon thereafter; the amount of work to be done to be determined by the commissioner and engineer.

"2d. The parties of the second part agree to pay a towing charge from Norfolk to New Inlet of $550.00, and in event the parties of the first part fail to secure a job of work at Wilmington, the parties of the second part agree to pay an additional towing charge of $550 from New Inlet to Norfolk.

"3rd. The parties of the second part agree to pay to the parties of the first part a per diem of $450 for such time as dredge is actually employed in doing excavation work.

"4th. In event it is found necessary to do any dredging in order to get around the bend between the bulk head and New Inlet, the parties of the second part agree to pay for such dredging at a per diem of $450.

"5th. In event of major breakdowns making machine shop work necessary, the parties of the second part will not be held liable for loss of time exceeding four days at the rate of $125 per day.

"6th. The parties of the second part agree to furnish fresh water to the edge of the cut and to furnish the services of the 'Katie M' for towing the dredge in and out of the channel. Also to furnish one power boat ('Croatan' or 'Katie M') to be used as a supply boat.

"7th. It is distinctly understood and agreed that the time for towing, installation and removal of plant shall not, in any event, exceed twenty days at a per diem of $335.00.

"8th. It is understood and agreed that the parties of the second part are to render all assistance possible in getting the outfit on and off the job.

CALKINS DREDGING COMPANY,
By (S) J. D. CALKINS, *President.*

NORTH CAROLINA FISHERIES COMMISSION BOARD,
          By (S) J. K. DIXON, *Chairman.*
          By (S) J. S. NELSON, *Commissioner.*"

On 26 January, 1925, thirteen days after the date of the agreement, the Calkins Dredging Company began towing its dredging outfit from Norfolk, Virginia, to New Inlet in Dare County, North Carolina. The towing was delayed, at North River, for several days, by a heavy storm, and the outfit did not arrive at the bulk head or bar off New Inlet until 31 January, 1925. Five days had thus been consumed in towing the dredging outfit from Norfolk to the bulk head or bar off New Inlet. But for the storm which delayed the towing several days after the dredging outfit left Norfolk, it would have arrived earlier. When the outfit arrived at the bulk head, it was ascertained that the channel in New Inlet was entirely closed, so that automobiles were being driven across the sand which had filled the channel. It was impossible, by reason of this condition, to float the dredge across the bulk head or bar, without grounding same. Representatives of both claimant and respondents were present when the dredging outfit arrived at the bulk head, and this condition was discovered. In the effort to get the dredging outfit across the bulk head to the place where it was to be installed and the work begun, under the agreement dated 13 January, 1925, it was grounded; thirteen days were consumed in getting the outfit from the bulk head or bar to the place where it was installed and where the operation began. The Calkins Dredging Company began the work of excavation and dredging on 13 February, 1925, one month after the date of the agreement, and continued said work until 12 March, 1925.

On 12 March, 1925, after an inspection of the work performed by claimant, under the agreement of 13 January, 1925, and after a consideration of all the conditions then existing at New Inlet, respondents concluded that it was not advisable to continue said work of dredging and excavation; claimant was thereupon, on said date, ordered to discontinue operations under the agreement of 13 January, 1925. The work was discontinued. Claimant was unable, on account of the conditions at New Inlet, to remove the outfit, and to have the same towed back to Norfolk until 15 April, 1925. On said date the return trip was begun, and the dredge arrived at Norfolk, under tow, on 16 April, 1925. Thirty-

five days elapsed from the date on which the work of dredging and excavation was discontinued, to wit, 12 March, 1925, to the date on which the return trip to Norfolk, by tow began, to wit, 15 April, 1925.

Claimant was paid on 5 March, 1925, the sum of $13,900.93 by voucher No. 362; this sum included the amount agreed to be paid for the towing charge from Norfolk to New Inlet; the amount per diem for five days consumed in towing the outfit from Norfolk to the bulk head or bar off New Inlet; the amount per diem for thirteen days consumed in moving the outfit from the bulk head to the place where it was installed, and where the operations were begun; and, also, the amount per diem for dredging and excavation from 13 February to 28 February, 1925.

Claimant was further paid on 20 April, 1925, the sum of $6,170 by voucher No. 533, this sum included the amount per diem for dredging and excavation from 1 March to 11 March, 1925; the amount per diem for two days on account of the removal of the outfit from New Inlet to Norfolk; and also the amount for towing charges for the return trip from New Inlet to Norfolk.

Claimant has been paid by respondents, under the agreement dated 13 January, 1925, the sum of $1,100, the towing charges for the trips from Norfolk to New Inlet, and from New Inlet back to Norfolk; the sum of $12,000, for dredging and excavating, 26 days and 16 hours at $450; the sum of $6,700, for time consumed in towing, installing and removing outfit, 20 days at $335; the sum of $270.93, for extras allowed, making a total of $20,070.93.

On 20 April, 1925, four days after the dredging outfit had arrived at Norfolk, the Calkins Dredging Company rendered to the North Carolina Fisheries Commission, at Morehead City, N. C., a statement showing that the amount then due for services of its dredging plant "as per contract dated 13 January, 1925" was $6,170. Voucher No. 533 was thereupon issued for said sum, payable to Calkins Dredging Company, on the face of which the following words were written: "Settlement in full for balance due on contract dated 13 January, 1925, charge New Inlet." This voucher was duly presented to the State Treasurer, who thereupon issued a warrant for the sum of $6,170 payable to the order of Calkins Dredging Company, "in full payment of the within account." This warrant, bearing the endorsement, "For deposit, Calkins Dredging Company, Inc., J. D. Calkins, President," was duly paid upon presentation to the Eastern Bank & Trust Co., New Bern, N. C., upon which it was drawn.

Claimant now presents a claim against the State of North Carolina, the Fisheries Commission of North Carolina, and the Fisheries Commission Board of North Carolina, for the sum of eleven thousand and fifty

dollars ($11,050.00), alleging that said sum is due for the time which elapsed from 14 March to 15 April, 1925—35 days—during which its dredging outfit remained at New Inlet, after the discontinuance of the work under orders from the Fisheries Commission Board, until the date on which it began the return trip to Norfolk. Claimant contends that it is entitled, under the agreement dated 13 January, 1925, to a per diem of $335 for 35 days and prays that this Court recommend that the General Assembly, at its next session, provide by appropriation from the general funds of the State for the payment of the amount of the claim, to wit, $11,050.

The jurisdiction of this Court, which claimant invokes by this proceeding, is conferred by section 9 of Article IV of the Constitution of North Carolina. It is an original jurisdiction; it may be exercised only when application is made direct to this Court. It is confined to the hearing of claims against the State, which by reason of the sovereignty of the State cannot be made the subject of litigation in the courts of this State, or in any other courts. "It is well settled that a state cannot be sued in its own courts, or in any other, unless it has expressly consented to such suit, except in the limited class of cases in which a state may be made a party in the Supreme Court of the United States, by virtue of the original jurisdiction conferred on such court by the Constitution of the United States." 25 R. C. L., 412. Nor can a commission or board, created by statute, as an agency of the State be sued. *Carpenter v. R. R.,* 184 N. C., 400. The decision of this Court upon a claim against the State, which it shall hear, in the exercise of this jurisdiction, is merely recommendatory. The Court has no power to render judgment upon a claim against the State, adjudicating finally the rights of the claimant or of the State with respect to said claim. No process in the nature of execution may issue upon any decision which the Court may make, after hearing a claim against the State to enforce the same. The General Assembly is in no wise bound by the decision of this Court upon the validity or invalidity of such claim. It may take such action upon the claim, if presented to it, as it deems just and proper, and in accordance with a sound public policy. The recommendation of this Court will have such influence only upon the action of the General Assembly, as its members shall deem it entitled to. It is, however, the duty of this Court to hear such claim against the State as may be properly presented to it and if the Court decides that under the law the State is liable, and but for its exemption by reason of its sovereignty from suit, a judgment could be recovered against the State on the claim, by the claimant to make its recommendation to the General Assembly, at its next session, for its action with respect to the payment thereof. The procedure to enforce claims against the State is prescribed by C. S., 1410.

DREDGING CO. *v.* STATE.

In *Bledsoe v. The State,* 64 N. C., 393, *Justice Reade,* writing for the Court, says: "We are of opinion that it was not contemplated that when a claim is presented against the State there shall be a 'trial of the facts in detail, but only that we should decide such questions of law as may seem to be involved, together with our own impression of the facts generally, so as to make our decision of the law intelligible." *Pearson, C. J.,* in *Reynolds v. The State,* 64 N. C., 461, says: "We are fully satisfied, on a perusal of the papers in the proceeding, of the correctness of the view taken in *Bledsoe v. The State, supra,* to wit, that our 'recommendatory jurisdiction' in regard to claims against the State does not embrace cases involving mere matters of fact, and that it was not the intention of the framers of the Constitution to impose upon the Court the labor of the trial of facts, and that the jurisdiction is confined to claims where, the facts being agreed on, it was supposed an opinion of the Supreme Court on important questions of law would aid the General Assembly to dispose of such cases; it having been before a question whether the judges could consistently with their constitutional duties, communicate an opinion to the Legislature." In *Clement v. The State,* 76 N. C., 199, the Court, being unable to decide the questions of law involved in the claim against the State, until it was sufficiently informed of the facts, formulated issues of fact and directed that same be submitted to a jury, to be determined by them from the evidence offered; it further directed "that the finding of the jury, and the rulings of his Honor, with all exceptions, be certified to this Court." The issues were submitted to a jury at June Term, 1877, of the Superior Court of Wake County. Upon the proceedings in the Superior Court being certified to this Court, a decision was made upon the validity of the claim, and it was ordered that a report of said decision be made to the Governor of the State to be transmitted by him to the General Assembly; *Clement v. The State,* 77 N. C., 142. In *Sinclair v. The State,* 69 N. C., 47, it was held that the recommendatory jurisdiction of the Court ought not to be invoked in matters of small value, particularly when there is no doubt as to the law. In *Horne v. The State,* 82 N. C., 383, *Justice Ashe,* says that although the amount involved may be small, the jurisdiction is properly invoked, when grave questions of law will probably arise in the investigation by the General Assembly of a claim against the State presented to it. The motion of the Attorney-General to dismiss the proceedings was denied. The proceedings to enforce a claim against the State, in *Reeves v. The State,* 93 N. C., 257, was dismissed for the reason that only questions of fact were involved, *Justice Merrimon* saying: "If the claim is a plain one, only involving questions of fact, it ought to be taken at once before the Legislature, unless its nature be such as that it may be presented to the Auditor, or some other

appropriate authority, for adjustment or allowance." In *Cowles v. The State,* 115 N. C., 174, *Justice Burwell,* discussing the jurisdiction conferred upon this Court by Art. IV, sec. 9, says: "It was intended by this provision of the Constitution that persons who asserted that they held legal claims against the sovereign State should here find a tribunal before which they might have, in proper cases, the legality of their claims adjudicated—a tribunal before which the sovereign State would, for a certain purpose, abdicate the privilege of exemption from liability to be sued and appear as any other litigant to the end that its liability to the petitioner might be determined by the law. We see no good reason why in such proceedings as this we should not be required to determine the rights of the petitioner and the liability of the State by the same laws that would govern those rights and that liability if the action was against an individual debtor." The Court held that as the claim in that proceeding would have been barred by the statute of limitations, if made against an individual, the plea of the statute by the State was a good defense to the claim, and held that it could not declare that the State was legally indebted to the claimant. The proceeding was dismissed.

In *Baltzer v. The State,* 104 N. C., 266, *Justice Merrimon* says that "the obvious purpose of the jurisdiction so conferred was to have the Court settle and adjudge the legal validity of claims, to the end that the Legislature may provide for their payment." The proceeding was dismissed for the reason that the General Assembly was expressly forbidden by section 6 of Article I of the Constitution to pay the claim presented therein, the Court saying that "it would be idle, futile and ridiculous for this Court to declare and adjudge the validity of a claim, against the State, and recommend to the General Assembly to provide for its payment, when the Constitution expressly forbids it to pay or provide for the payment of such a claim." See opinion of *Merrimon, C. J.,* in same proceeding, reported in 109 N. C., 188. This opinion was affirmed on a writ of error by the Supreme Court of the United States, 161 U. S., 240.

The proceeding in *Miller v. The State,* 134 N. C., 270, was dismissed; this Court declined to hear the claim presented in that proceeding, saying, in the opinion written by *Justice Montgomery,* "This case does not involve any question of law. We do not feel called upon, therefore, to make any recommendation to the General Assembly in the premises. If we should do so, the members of that body would have the right to feel justly offended that we should seek to point out their duty to them in a matter where there was no law question involved."

The claim presented by this proceeding presents no questions of law; the liability of the State is to be determined by the terms and provisions

of the agreement in writing, dated 13 January, 1925. Upon the facts as they appear from the pleadings, claimant has been fully paid all sums which respondents agreed to pay and for which they or the State were liable under the agreement. The terms and provisions of the agreement are clear and explicit; there can be no difficulty in interpreting or construing them. Claimant was entitled to payment for the time "for towing, installation, and removal of plant," not to exceed twenty days at $335 per day. More than twenty days were consumed in towing, installing and removing the plant; it was distinctly understood and agreed that respondents should pay for not exceeding twenty days thus consumed. This respondents have done.

Claimant, apparently anticipating that its claim against the State could not be sustained under the agreement in writing, signed by both claimant and respondents, alleges that said writing does not truly and correctly set out and contain the agreement with respect to payment for time consumed in towing, installing and removing its plant; it prays for reformation of said written agreement, on the ground that same was drawn and executed by the mutual mistake of the parties, or the mistake of claimant induced by false representations of respondents as to the conditions existing at New Inlet at its date. Upon the facts alleged in the complaint, we must hold that claimant has failed to show that it is entitled to such relief. The validity of its claim must be determined by the agreement, in writing, signed by both claimant and respondents; it is not alleged that the representations were both false and fradulent or that they were made by respondents for the purpose of inducing and that they did induce claimant to sign the said paper-writing. It clearly appears that the paper-writing as drawn and signed contains the agreement of the parties relative to its subject-matter.

After claimant's outfit had been returned to Norfolk, to wit, 20 April, 1925, it rendered a statement to respondents for amount due for services under the contract; voucher for this amount was issued by respondents and accepted by claimant as "settlement in full for balance due on contract dated 13 January, 1925." This voucher was accepted by the Treasurer of the State, who issued his warrant "in full payment of the within account." This warrant, with the endorsement of claimant, has been paid.

The following rule is well established in the State of North Carolina, and is consistently followed in the trial of actions in its Courts involving the rights of citizens and others, subject to their jurisdiction:

"It is well recognized that when in case of a disputed account between parties, a check is given and received clearly purporting to be in full or when such check is given and from the facts and attendant circumstances it clearly appears that it is to be received in full of all indebtedness of a

given character or all indebtedness to date, the courts will allow to such payment the effect contended for." *Rosser v. Bynum,* 168 N. C., 340; *Supply Co. v. Watt,* 181 N. C., 432; *Blanchard v. Peanut Co.,* 182 N. C., 20; *DeLoache v. DeLoache,* 189 N. C., 394.

We cannot decide that the claim against the State presented in this proceeding is valid as a legal obligation of the State or that claimant would be entitled to judgment against the State, but for its exemption from suit by reason of its sovereignty, and therefore can make no recommendation to the General Assembly for the payment of the claim. The proceeding must be

Dismissed.